Good morning. I gather you are also pro bono, right? Yes, Your Honor. We appreciate the help of pro bono counsel very much. Thank you. I'm very pleased for the opportunity. Good morning. My name is Jennifer Bentley, and I, along with student co-counsel Rebecca Young and supervising attorneys Gary Watt and Leah Sparrow, appeared today on behalf of the petitioner, Mr. Fernando Aguirre-Urbina. And since my time is limited, I will focus most of it on the cat claim and try to reserve about three minutes for rebuttal. Okay. Mr. Aguirre is entitled to relief under the Convention Against Torture because he has proven that it is more likely than not that he will be tortured and killed if he is removed to Mexico. The agency abused its discretion by failing to consider all relevant evidence and by basing its decision on flawed reasoning. So I want to be clear. Your argument is really that the denial of cat relief ought to be vacated and it's sent back to the agency, right? You're not arguing that we should give cat relief. No, Your Honor. Here, because the agency did consider the case fully and overlook a key piece of evidence and come to the wrong conclusion, and Mr. Aguirre has proven that he is entitled to relief. Isn't the most you can get on this us saying to the agency, go back and look at this key piece of evidence, are you saying that we should order cat relief by ourselves? Yes, Your Honor. This Court has done that before. I know, but that's why I'm asking. That's what you're asking us to do. Yes, Your Honor. That is what we are asking for. Because the record compels the conclusion that Mr. Aguirre is entitled to cat relief and because the Act states that cat relief is not discretionary, this Court should grant his petition and remand to the agency with instructions to grant the relief. In the alternative, the Court could, of course, remand to the agency with instructions to consider the entire record, in particular the 2015 threat against Mr. Aguirre's life, which it appears that they've overlooked. And in the alternative to that, the Court could, of course, remand with instructions to consider whether Mr. Aguirre's crime was particularly serious in light of this Court's recent decision in Gomez-Sanchez v. Sessions, and he might be entitled to withholding. Right, but that's a different question than the cat question. And I want to hear your argument on that one. You started with the cat question. Is the evidence — how compelling is the evidence about the government's involvement in any future activities? If I understand correctly, you're asking about the government acquiescence? Right. Correct, okay. Here, the record evidence indicates in the country conditions reports that the Sinaloa cartel works with the government and police officers in Mexico at every level of government and that they have police officers on the payroll. Not only that, the specific threats delivered to Mr. Aguirre on at least three occasions told him that the cartel works with the Mexican police and that they will consent or acquiesce to the torture. The 2015 threat that Mr. Aguirre received while he was in detention is particularly probative because it completely undermines the government's or the BIA's reason for denying the relief. That threat indicates that the Sinaloa cartel considers Mr. Aguirre to be a snitch, that they are waiting for him in Mexico to take their revenge, and it states at AR 719 that they indicated to Mr. Aguirre that they had resources there to deal with his kind in Mexico. So the inference is that there's no reason to take revenge on Mr. Aguirre here in the United States where there, of course, is no evidence of acquiescence or working with the Sinaloa cartel, whereas in Mexico they operate with impunity. Your argument, I think, at least at the beginning, was that the IJBIA simply didn't take any of this into account. Is that what happened, or you think they gave inappropriate weight to what the claim was? No, Your Honor. It appears from the BIA's decision at AR 7 that the BIA did not take the threat into account that occurred in 2015. There's simply no way to read that decision as considering that recent threat. The BIA's decision there states as the primary reason for denying relief. Excuse me. Is this the one where it's communicated to the sister? Is that right? The communication to the sister, which is at AR 1103, occurred in October of 2012. But the 2015 claim, which was a threat, was communicated to Mr. Aguirre while he was in detention, and that was by Javier. And that occurred in March of 2015. And then the BIA characterized that threat as no contact in years. So there's simply no way to read the 2015 threat as having been considered in the agency's decision because it was only 15 months old in the record as the agency reviewed it. I apologize. With respect, a threat without anything more, is that sufficient to warrant cat relief? Yes, Your Honor. What case do you cite for that? Hosseini v. Gonzales.  Wasn't there some violence associated with that? Wasn't either the petitioner or a family member or someone close either killed or beaten in that situation? No, Your Honor. That case involved the immigrant came from Iran on a student visa, and then he was part of a group called MEK, and he helped to perhaps recruit and distribute materials on behalf of the group. But there, in that case, were no direct threats to the immigrant. It was simply the threat of future torture, which was shown by the country report solely. And here, this Court has said in Parada v. Sessions that country conditions evidence alone can be enough to establish government acquiescence or consent. Here, because we have not only the country conditions evidence that speaks to government acquiescence when the Sinaloa cartel acts against snitches, we have the specific threats that state that the cartel does work with the police in locating snitches and that the police take no action. And the — those statements are primarily provided by Mr. Aguirre in his testimony and his declarations, but the I.J. did find him credible at AR 960, so the Court — And you — I want to be clear on this. On the Catt claim, you think the record compels the conclusion that the government would acquiesce in some future torture. The I.J. found to the contrary as a matter of fact, and the BIA upheld that determination. And you're saying, looking at this record, the only conclusion that anybody could possibly reach is that your client would face future torture either at the hands of or with the acquiescence of the Mexican government? Correct, Your Honor. Because Mr. — Don't the country reports, aren't they a little bit ambivalent on that issue? They — they say, yeah, there's corruption, but the government's trying to overcome it, and — and, you know, there's — it's not — it's not entirely pervasive? Respectfully, no, Your Honor. The country conditions reports may point to some efforts made by the government to combat the issue. However, there are — it's far outweighed by conflicting reports by the State Department, by the New York Times, by Human Rights Watch, that the Mexican government is largely ineffective. And the standard that this court set in Madrigal v. Holder is not that an immigrant must prove that the entire government would consent or acquiesce to the torture, but only that a single official would. And here, at AR-799, AR-802, there is — and other places, there's ample evidence that the Sinaloa cartel works with police and the government in locating snitches. So are you saying that — right now we're focused on CAT, but it sounds like you're saying that whether it's withholding or any aspect of this, if you're talking about Mexico, if government acquiescence is an element that you have to show, it's done? Because all you need to do is look at the country report site, what you're talking about, and it's all there. There's nothing to talk about. Is that correct? This Court has said that the country conditions evidence alone can be enough to show government acquiescence. Sure. Sure. But his question is, is it alone enough in this case to compel the conclusion of acquiescence? Not that it's — not that it can support it, but is it enough alone to compel it? Here, we have not just the country conditions evidence. We have the threats to Mr. Aguirre. So your answer is, no, alone it's not. You're saying there's something else in this case. I'm saying perhaps alone it would be enough. The country conditions evidence, looking at page 726 and 728, speaks of how the cartels find and locate — they locate snitches and then they torture and kill them. They hang them or they leave them beheaded in public places with signs affixed to them to deter other snitches. One report states that 17 percent of all of the cartels' murder victims were for being suspected informants or traitors to the gang. And while that report does speak of the violence by cartels in general, we know from the country conditions reports that the Sinaloa cartel is the oldest and largest drug organization in Mexico. So, yes, the country conditions evidence supports the acquiescence. But here, we have even more than that. We have the specific threats. Mr. Aguirre was told, we will wait for you in Mexico and the police will help us find you. And they took pictures of his tattoos so that they could make good on their threats. I'm sorry. Your time is running low. Before you sit down, can you address your reliance on Sanchez-Gomez, or Gomez-Sanchez rather, and just explain why you think that case now entitles you to a remand on the withholding claim? Yes, Your Honor. Mr. Aguirre's crime should be reconsidered in light of that case because his mental illness was not considered as whether in terms of his criminal culpability. And so in light of Gomez-Sanchez v. Sessions, we would ask that in the alternative that this Court remand with instructions to reconsider as it did in Casasola v. Whitaker. How do you get past the exhaustion requirement? Gomez-Sanchez v. Sessions was a new rule, and it simply wasn't available to Mr. Aguirre to appeal that previously. And in the interest of judicial economy and not wasting the Court's time, it would have been a futile argument prior to Gomez-Sanchez v. Sessions. I thought at the time that the BIA considered this matter of GSS, that was a BIA decision. According to Gomez-Sanchez, it was incorrectly decided because other BIA decisions had ruled to the contrary. So the BIA could have changed its own rule, presumably, without involvement of our Court. So for purposes of exhaustion, do we consider the fact that the BIA was at liberty to change its own rule in determining whether exhaustion is required? Can I address that point on rebuttal, Your Honor? I see only about two minutes. Sure. We don't have rebuttal, do you? Of course you do. I just wanted to see what you'd say. Morning, Your Honors. May it please the Court, my name is Jennifer Singer, and I represent the United States Attorney General, the respondent in this matter. Given that Petitioner's Counsel kind of focused on the Catt claim, I will just jump right into that, as I think the safeguards, I think there were sufficient safeguards in place. Turning to the issue of Catt deferral, the Petitioner maintains that he will be tortured in Mexico at the hands of the Sinaloa cartel members because they perceive him to be an informant. And there's two issues. First — The I.J. finds him credible. The I.J. does find him credible. So we start off with the assumption that he is a snitch. I don't think you can take it that far. Well, he says. I mean, we take all his testimony is true on this issue, right? His belief in those statements are true, but the accuracy is something different. Simply because someone says something doesn't necessarily make it true. And there were statements that Petitioner did make initially, thinking that Javier was in Mexico when it turned out that that was not the case. So even though he was credible, his belief in what Petitioner testified to, yes, that was taken as true. But the accuracy of those — Well, but I'm trying to find out what the I.J. found. Did the I.J. find that he — that nobody in Mexico really thought he was a snitch? The I.J. did not state that, no. Okay. So what is the accuracy? If the I.J. didn't deal with the accuracy of the statements, why should we? I think the I.J. found that the fear was speculative, and in the sense that — Yeah, and that's — we can deal with that. I mean, that's a — but the I.J. didn't say, oh, you're really wrong. You don't have this fear. He said, you're just speculating about this fear. That's correct. And speculations are insufficient to warrant cat protection. Part of his — I mean, part of the speculative nature is that the distance between the threats that were levied, simply because Javier said these things to him, doesn't necessarily mean that he will take action on those threats. People say things all the time and don't fulfill what they say they're going to do. So in that sense, it's speculative. Also, the time and distance between the threats and at the time the immigration judge and the board made their decisions only expanded and diminished the nature of the threat. It's also unclear whether anyone would even know Petitioner would be in Mexico to act on these threats. And the speculative nature is also underscored by the fact that just the record itself, Petitioner says that he's perceived to be a threat, but it just seems very tenuous when Petitioner also testified that he was — his criminal actions had nothing to do with Javier's, that those two — the raid on Javier's house had nothing to do with Petitioner. Petitioner was not a confidential informant. He was not a co-defendant. He did not snitch. There was nothing to tie those two incidents together. It was just Javier making threats. It could be that Javier just simply didn't like Petitioner or he had a — Yeah, and that's why I'm asking the question. I'm trying to figure out what the IJ held and what facts you think are different. The IJ didn't say there's no evidence you were a snitch. He did not, but he did say it's speculative, and that is part of the speculative nature. Your fear of being harmed when you go back is speculative. That's correct. He didn't say the premise of your fear is false. That's correct, but the fear of — See, and that's what you seem to be arguing. You seem to be arguing, well, there's no real evidence he was a snitch. There's no real — you know. But what the IJ said was, look, you may have had some threats. I find it credible when you say people threatened you. But your fear of being harmed when you go back is speculative. That's very different than undermining the basis of his fear. And that's what you seem to be arguing. That's just one aspect, but the IJ did say that the fear is essentially diminished because the threats did happen a long time ago. That's what the IJ said, and that's still borne out by the record. The IJ also seemed to suggest that Petitioner had no idea where Javier was, and his whereabouts has a direct impact on whether anyone would know where Petitioner would be, when he would be in Mexico, if he was in Mexico, where in Mexico he would be, to even start the chain of events going to bring him under the radar of Felipe or Javier or any other cartel member. And the IJ did say those things, and those are speculative. Turning to the issue of acquiescence, which is a separate issue, because this CAT claim, in my view, falls simply on the speculative nature aspect. The acquiescence is a separate aspect, which the IJ and board did separately address. And the record just simply does not compel the conclusion that the Mexican government will acquiesce to Petitioner's torture. Yes, there is corruption. Yes, Javier said that they have some buddies in the police department, but that is simply not enough. The record also shows that the Mexican government combats corruption. They just, I think there's some three or four articles in the record from 2016 saying that there was just a huge crackdown on the Sinaloa cartel, including the arrest of El Chapo. That was recent. That was just one amongst several arrests, and that they're cracking down on the cartel. That goes to show that, you know, the government is trying to combat crime, combat the Sinaloa cartel in particular, and try to curb corruption. That record just simply does not compel the conclusion that the government will allow Petitioner or acquiesce to his torture. Maybe you can make your friend's job easier on rebuttal. What's your position with respect to the mental health evidence and its effect on the serious crime determination? So I the court should the proper remedy in that is for the Petitioner to file a motion to reopen based upon new evidence. That claim is Well, it's not new evidence. See, that's my problem. I'm sorry. If we remit the Petitioner to that, surely not you, but somebody who looks like you in front of the agency will say, this is not new evidence. He knew about it a long time ago. So why isn't the more appropriate thing for us to do to say, look, you had case law which seemed to suggest at the time this was not relevant. You can get to Judge Smith's question later whether or not he should have asked them to change the case law. But now the case law is different, and send it back, and you can consider this. Why not do it in this proceeding rather than in a motion to reopen? Sorry, I misspoke. I meant based upon new law, because Petitioner could have exhausted this before the Board. He could have been Sanchez himself. The whole premise of that was mental health goes to the particular serious crime determination. This whole case is essentially about mental health and competency. Right. So that's Judge Smith's question. And at the time the immigration judge made the original decision, the Board had not yet decided matter of GGS. So at the time the immigration judge made the decision, it was more than appropriate for Petitioner to argue that his mental health should be factored into the PSC determination. Let's explore that. If matter of GSS had not been decided at that point, then was the controlling law that mental health was appropriate and did go to the seriousness of the crime or could affect that? I don't. I'm speaking of the BIA's law at that point. At that point, at the time of the IG's decision, I'm not sure what the actual state of the PSC determination, but obviously it wasn't a necessary factor to be considered. Otherwise, matter of GGS wouldn't have come to light. The reason I want your input on this is because Gomez-Sanchez specifically overruled matter of GSS. But it said that the BIA had previous authority that allowed the consideration of the mental health factor. So if that was in effect and the matter of GSS was not in effect at the time, then there would have been no impediment to Petitioner to bring that up. And if he didn't bring it up then, then we do have an exhaustion claim, do we not? Yes. That strengthens the exhaustion argument. I mean, this whole case, Petitioner's case, really focuses around competency issues. And at the same time he was litigating the case before the IJ, he had a collateral matter in criminal court seeking to vacate his conviction based upon mental competency issues. So, I mean, Petitioner counsel and Petitioner was on notice. I mean, obviously he knew that mental competency was an issue in this case, and that should have been argued before the immigration judge. So I would argue that exhaustion bars the court from. It's kind of a strange argument, I mean, both ways. What you're saying is he should have made this argument. He surely would have lost it because matter of GSS came right after, right? In terms of timing, he was in front of the IJ when? Initially, I think the immigration judge's first decision. When was the second decision issued? 2014, I believe. Before or after matter of GGS? The second decision after the first remand. Because, remember, what happens is the board remands and you've got to start all over again. And the IJ says, the way I'm going to start all over again is by reissuing my original decision. So when was the second IJ decision issued? Second IJ, I want to say is in 2014, but the original one that was not reincorporated. There's three decisions. Yeah, right. The original one that was not reincorporated was prior to the board's decision in matter of GSS. But the second IJ decision, I can't find the date of it. I can't either. But we're dealing with July 17th, 2014. That's when GSS comes down. I think the second one came after the board's decision in matter of GSS. So that when he was remitted to the IJ, in effect, what you're saying is he should have raised it two years before? He should have raised it, yes, in the original proceeding. If the second IJ proceeding were the original proceeding, you would agree that it was foreclosed at that time, would you not? By GSS? Yes, by GSS, yes. Okay. And it would be different posture now because given that Gomez-Sanchez changed the overruled matter of GSS, then the appropriate remedy would be a motion to reopen based on the change in law. I understand your position. If there's no further questions, I'll rest on the briefs. I think not. Thank you. Thank you, Your Honors. I suspect you're preparing to do this, but just to be sure, you just heard this colloquy about matter of GSS, the timing, basically the exhaustion issue. Can you address that, please? Yes, Your Honor. The IJ's second decision was in 2016. The second hearing was in January of 2016. Right, and that was well after GSS. Well after GSS, Your Honor. Your colleague says, well, that may be so, and if that were the original proceeding, then I'd understand why you didn't raise it, but you should have raised it back in 2012 or whenever it was when the law was unclear. My question is, what's the effect of the 2016 remand? The remand seems to say we're sending this back on the issue of mental competency. So to me, that's a remand that says put in evidence on the issue of your mental state. It doesn't say it's restricted to a particular issue, does it? Not as I read it, Your Honor, but the remand, when it went back in 2016, was because the IJ had conflated the two-step process set out in matter of MAM. But as to ---- So could you have, when it went back, said, hey, you wouldn't because GSS was out. But were you free to, at that point, assert that your client's mental competency also bore on the issue of whether this was a serious crime? Or do you think the remand was limited to that issue alone, competency issue alone? I ---- The way that I read it is that GSS had already foreclosed that argument. Could you ---- That's my question. But could you ---- You wouldn't have made it. Were you free to make it and get it rejected or ---- Perhaps. But that's not what we have before us. And what we do have is the case law that says that it would be clogging the judicial pipes to, for once this court had already granted review of the other matters, for us to then file the motion to reopen with the agency. Time's up. Let me ask my colleagues if they want to clog the judicial pipe further. Further affiance saith not. So we thank you very much for your argument on both sides. Thank you again for acting as pro bono counsel. The case just argued is submitted. We will now hear argument in the final case of the day, which is Welges v. Trenet Group, Inc.
judges: M. Smith, Watford, Hurwitz